No. 75,283

In the Matter of CHARLES E. HILL, *Respondent*.

(915 P.2d 49)

Opinion filed April 19, 1996.

*Mark F. Anderson*, disciplinary administrator, argued the cause and was on the brief for petitioner.

*John W. Johnson*, of Bradshaw, Johnson & Hund, of Wichita, argued the cause and was on the brief for respondent, and *Charles E. Hill*, respondent, appeared pro se.

*Per Curiam*: This is an original disciplinary proceeding filed by the Office of the Disciplinary Administrator against Charles E. Hill, arising from his failure to prevent the statute of limitations from running on various medical malpractice claims of his clients. At the hearing on the complaint (case No. B5916), the Disciplinary Administrator recommended to the hearing panel of the Kansas Board for Discipline of Attorneys (Board) that Hill's license to practice law be suspended for 2 years while Hill is probated under certain terms of supervision proposed by Hill's counsel. The panel did not adopt supervised probation, recommending a 2-year suspension. Hill filed exceptions to the final hearing report.

The question is whether we should adopt the panel's recommendation or the recommendation of the Disciplinary Administrator.

A majority of the court adopts the recommendation of the panel. Respondent is suspended for a period of 2 years from October 16, 1995, the date of the panel's report.

## FACTS

Respondent graduated from law school in 1980. The facts as summarized in the panel's report are:

"Respondent . . . initially worked in the office of the Kansas Commissioner of Insurance with his primary responsibility being as administrator of the Health Care Stabilization Fund. He then went to work for the Kahrs, Nelson firm in Wichita.

"Respondent became a partner in the firm within eighteen months of his employment. Eventually, some of the partners in the firm became dissatisfied with the number of hours billed by respondent. As a result respondent was demoted from partner to associate. In December of 1991, respondent resigned from the firm, to take effect in February of 1992. Respondent admitted that he had trouble with productivity during the latter part of his tenure with the Kahrs, Nelson firm.

"For a period of time after resigning from the firm, respondent was allowed to continue to go to the Kahrs, Nelson office while he looked for other employment. During this period he became increasingly dysfunctional and had suicide ideations. After an incident in which respondent contemplated suicide, his wife encouraged him to seek psychiatric help. He was admitted to St. Joseph Hospital for a ten-day period. He continued sporadically with outpatient treatment after the hospitalization. He had problems getting appointments and with insurance coverage.

"After being discharged from St. Joseph Hospital, respondent contacted Steve Foulston, a sole practitioner in Wichita. Mr. Foulston agreed to let respondent use an office in his building to attempt to find a job and eventually referred several cases to respondent. Mr. Foulston primarily was involved representing plaintiff in a personal injury litigation. He gave cases to respondent, helped finance the cases and supplied an office to respondent at no charge. Respondent characterized the association as being very enjoyable. They even discussed the possibility of forming a partnership.

"While officing with Steve Foulston, the respondent became involved with the five cases which form the basis for the Formal Complaint. The evidence presented with regard to each case was as follows:

### "SILER CASE

"Dixie Siler was referred to respondent by someone other than Steve Foulston. She was involved in a medical malpractice case. The case had been reviewed and rejected by at least one other law firm prior to being taken by respondent. On the eve of the expiration of the statute of limitations, respondent requested that a malpractice screening panel be appointed to evaluate the case. Respondent failed to take any further steps with regard to the screening panel, it was ultimately dismissed, and the statute of limitations ran on plaintiff's claim. Respondent failed to advise Ms. Siler that the case had been dismissed or that the statute had run. Ultimately, when he did talk with his client, respondent lied to her about the status of the case.

"Respondent's malpractice insurance carrier has indicated that it will cover the claim of Ms. Siler.

### "CONVERSE CASE

"The second case involved in the complaint involved both a medical malpractice claim and an automobile negligence claim on behalf of Myron Converse, a chiropractor from Junction City. The case was referred to respondent by Mark and Andy Hutton. The statute on one or both of the cases was on the verge of running.

Respondent filed suit, but failed to secure service on the defendants. The statute then ran. Respondent admits knowing the procedure and time constraints involved in securing service and acknowledges that he just failed to properly handle the case.

"After respondent obtained representation concerning his disciplinary problems he notified Dr. Converse of the running of the statute. Dr. Converse hired an attorney and made a claim against respondent's insurance company which was settled for $260,000.00.

### "HAMILTON CASE

"The next case involves a malpractice case for Amy Hamilton which was referred to respondent by Steve Foulston. Respondent requested a malpractice screening panel which was dismissed for lack of prosecution. Thereafter respondent allowed the statute of limitations to run. He then lied to both the client and Steve Foulston about the status of the case. Upon inquiry by Mr. Foulston, Ms. Hamilton indicated she did not wish to pursue the matter further.

### "MARTIN CASE

"The fourth case involves another malpractice case in which respondent requested a malpractice screening panel for James Martin. Again, the panel was dismissed for lack of prosecution and the statute of limitations ran. Mr. Martin called respondent asking for a status report on the case and respondent told him that he was waiting for the screening panel report. Finally, Mr. Martin called once again and respondent once again told him he was awaiting the panel report. This time, Mr. Martin informed respondent that he had talked with Judge Corrigan and knew the case had been dismissed. Respondent went to Mr. Martin's house that afternoon and told Martin and his wife what had happened. Both conversations were recorded by Mr. Martin. Respondent prepared a settlement agreement with Mr. Martin for $35,000.00, payable over a period of time. Mr. Martin had the agreement reviewed by an attorney and the agreement was signed. Respondent has paid one installment of approximately $5,000.00 on the agreement and has failed to make any further payments. The respondent has now received a discharge in bankruptcy and Mr. Martin's debt appears to have been discharged. For that reason, respondent believes his malpractice carrier will not pay the Martin claim.

### "THOUVENELL CASE

"The last case involved in the complaint is the Thouvenell case, referred to respondent by Steve Foulston. It was another malpractice case involving another dismissed screening panel and lapsed statute of limitations. Again, respondent lied to Foulston about the status of the case.

"After being confronted by Mr. Martin, respondent told Steve Foulston of his situation. At Mr. Foulston's suggestion, respondent met with Foulston and Mike Stout and Bud Fanning of the Wichita Bar Association. His files were taken over

by the Bar Committee and respondent mailed a letter dated March 24, 1994, to the Disciplinary Administrator wherein he self-reported the incidents.

"After the meeting with Steve Foulston and the Wichita Bar representatives, respondent entered into therapy with Dr. Graff and was diagnosed as having major depression. He has continued therapy with Dr. Graff and Paxil has been prescribed for his depression. At the suggestion of Mark Anderson, Disciplinary Administrator, respondent was evaluated by Dr. Ted Moeller and his associates. He has been involved in a weekly therapy group with Dr. Moeller since May or June of [1995].

"Through Dr. Graff, respondent became acquainted with the owner of AAA Rentals. He has worked for $7.00 per hour for the rental store owner. He has found the work to be satisfying. Respondent also did research for Mark Hutton from July through October of 1994. He helped Bob Kaplan, another Wichita attorney, on a contract basis to prepare a malpractice case. He has continued to do contract case preparation for Mr. Kaplan. He has also done research for John Johnson. In none of these positions did he have client contact. He was assigned specific tasks which he carried out. During all of this time respondent continued to work for AAA Rentals. He testified that he quit that job the week before the hearing.

"The parties offered a stipulation that respondent has entered into discussions with a major medical center located in Wichita concerning the possibility of employment with the center in the general counsel's office. The medical center is in the middle of a merger and a decision cannot be made about respondent's employment until the merger is completed. Respondent was unsure whether the job required that he be licensed to practice law.

"Dr. Theodore Moeller testified that respondent has a *unipolar mood disorder*, which in respondent's case means he suffers from depression. It was Dr. Moeller's opinion that respondent has benefitted from and will continue to benefit from drug therapy with serotonin re-uptake inhibitors such as Prozac, Zoloft and Paxil. Gradually a person suffering from depression will experience a remission of his or her symptoms if treated with serotonin re-uptake inhibitors. Dr. Moeller went into a great deal of detail concerning the respondent's condition and the treatment.

"In the end, Dr. Moeller was asked whether Mr. Hill can presently practice law where that term means 'practicing as an independent practitioner representing the client's interest in a court of law, filing appropriate documentation, that kind of thing.' Dr. Moeller's opinion was that respondent cannot presently practice law because he is still depressed. While Dr. Moeller believes that respondent is getting better he does not feel he is well enough yet to practice law. He does believe that respondent can practice under supervision where 'he does nothing independently.' Pages 46 through 47 of the transcript contain a complete description of the type of supervision envisioned by Dr. Moeller. Dr. Moeller did not think that respondent would be able to fully return to the practice of law for at least another year.

"Respondent testified that he does not think he can engage in the unsupervised practice of law at this time. He does, however, think he can practice law with supervision.

"Steve Foulston testified to his relationship with respondent and to his respect for respondent's ability. He stated that he was a victim of respondent's malpractice and deceptions since he referred cases to respondent which were handled improperly and respondent lied to him about the status of those cases. He had to contact the clients and tell them about the situation and attempt to help the clients resolve their difficulties. Nevertheless, he feels that respondent is a talented lawyer and a nice guy. He believes that if respondent gets his problems behind him he will be a credit to the bar.

"Judge David Kennedy testified that in his opinion respondent was a lawyer of 'exceptional' ability, approaching what he would call the 'elite group of trial lawyers in Sedgwick County or the State of Kansas for that matter.' He defines *elite* as being the top three, four, or five lawyers in the county. He believes that respondent has a very high reputation among the judges in the Eighteenth Judicial District. He describes respondent's professionalism as being 'the best.'

"Robert Kaplan, a practicing attorney in Wichita, testified that he has known respondent for some time. He holds him in high regard as an attorney. He called respondent to help him with a plaintiff's malpractice case he was handling because of both his experience in malpractice cases and because of his defense perspective. He hired him on a contract basis to help prepare the case for trial. He was exceptionally satisfied with respondent's work. He and his partner have continued to contract with respondent to handle various legal tasks for them.

"Mr. Kaplan testified that the relationship which he has with respondent is precisely the supervisor/supervisee relationship described by Dr. Moeller in his testimony. Mr. Kaplan testified that he was willing to supervise respondent's practice; although, he would like to have the parameters of his supervision spelled out. He believes that respondent should be allowed to continue in the practice of law and is willing to assist in that endeavor.

"Respondent introduced as Exhibit 7 a proposal concerning supervised probation for respondent.

## "FINDINGS OF FACT

"By clear and convincing evidence the panel unanimously finds that:

"1. The respondent is an attorney at law . . . with a last registration address filed with the Clerk of the Appellate Courts [in] Wichita . . . .

"2. In his improper handling of the five cases set out above, respondent failed to diligently and promptly pursue each case, failed to accomplish work necessary to a successful representation, failed to keep his clients reasonably informed of the status of the subject of the representation, and failed to respond to the reasonable requests for information by his clients.

"3. In the course of his representation of his clients Siler, Hamilton, Martin, Converse and Thouvenell, respondent engaged in conduct involving misrepresen-

tation by making false statements to his clients about the status of the matters involved in the representation."

The complaint is based upon Hill's self-reporting of cases in which he allowed the statute of limitations to expire on his clients' claims. The violations occurred over approximately a 16-month period. The complaint alleged that Hill violated MRPC 1.3 (1995 Kan. Ct. R. Annot. 257) (reasonable diligence in representing client), 1.4 (1995 Kan. Ct. R. Annot. 263) (keeping client reasonably informed and complying with reasonable requests for information), and 8.4 (1995 Kan. Ct. R. Annot. 340) (engaging in conduct involving misrepresentation). Hill's answer stipulated to the factual allegations in the complaint. The Disciplinary Administrator recommended to the panel that Hill's license be suspended for 2 years and probated for that time period, subject to the supervisory conditions proposed by Hill's counsel, with the additional condition that the Disciplinary Administrator be allowed to approve in advance any other contract work to be done by Hill or any change in the structure of supervision.

The panel chose not to adopt the Disciplinary Administrator's recommendation and instead recommended a 2-year suspension. In the panel's view, the evidence indicated that Hill's mental disability rendered him incapable of practicing law. The panel was also concerned that Hill was not making restitution to Martin.

Hill takes exception to several findings in the panel's report. The Disciplinary Administrator has adopted Hill's arguments and authorities and supports Hill's position.

## DISCUSSION
### Standard of Review

Rule 212(f) (1995 Kan. Ct. R. Annot. 215) provides:

"The recommendation of the panel or the Disciplinary Administrator as to sanctions to be imposed shall be advisory only and shall not prevent the Court from imposing sanctions greater or lesser than those recommended by the panel or the Disciplinary Administrator."

"In *State v. Klassen*, 207 Kan. 414, 415, 485 P.2d 1295 (1971), we explained that we have a 'duty in a disciplinary proceeding to examine the evidence and determine for ourselves the judgment to be entered.' In *State v. Ziegler*, 217 Kan. 748, 755, 538 P.2d 643 (1975), this court stated that, although the report of the

disciplinary board 'is advisory only, it will be given the same dignity as a special verdict by a jury, or the findings of a trial court, and will be adopted where amply sustained by the evidence, or where it is not against the clear weight of the evidence, or where the evidence consisted of sharply conflicting testimony.' [Citation omitted.]" *In re Carson*, 252 Kan. 399, 406, 845 P.2d 47 (1993).

## Hill's Exceptions to Report

Hill filed exceptions to the report concerning three issues: (1) Hill's present ability to practice law with appropriate supervision; (2) the Martin settlement; and (3) the panel's conclusion that the level of supervision requested by Hill and recommended by the Disciplinary Administrator would create a new type of limited law practice.

Hill contests the panel's statements that both Dr. Moeller, the examining psychologist, and Hill testified that Hill could not presently practice law. According to Dr. Moeller, Hill remains incapable of "managing his own practice of law and meeting with clients and handling their affairs." Hill stated: "I don't think that I'm in any position to hang up a shingle and open my own office." Hill felt he could "try a jury case as well as just about anybody around," but "couldn't handle the pressure and the stress of running an office and having to worry about making an income and paying the bills and keeping the files." He felt he could handle the pressure and stress of meeting deadlines in a case "to a limited extent."

Hill argues that the above testimony only indicated that he was not capable of engaging in solo law practice at this time. A fair reading of the testimony discloses that Hill's problems go beyond lacking ability to cope with the pressures of a solo practice.

Hill disputed the panel's conclusions that Hill's indifference to making restitution to Martin was an aggravating factor, Hill's partial payment to Martin was nullified as a mitigating factor by Hill's subsequent bankruptcy, Hill's attitude about Martin's lack of remedy was "somewhat cavalier," and restitution to Martin should be made a condition of Hill's reinstatement.

When asked by the panel whether Hill intended to make any further payment to Martin, even though the indebtedness was discharged, Hill acknowledged a moral obligation but stated that financially he was not in a position to make any further payments:

"Hopefully some day I would be in the position." This statement does not indicate any present intent to do anything further for Martin.

The circumstances surrounding Hill's settlement with Martin are troublesome. Had Martin pursued a legal malpractice claim against Hill instead of agreeing to Hill's offer of a settlement, his claim may have been covered by Hill's malpractice insurance. Had Hill made any effort to pay something more to Martin after the first and only payment, Hill's acknowledgment of a moral obligation to make things right with Martin would appear more sincere. Hill's offer induced Martin to remain silent, thus keeping Hill's problems hidden for several more months. Hill succeeded in playing upon the sympathies of Martin.

The panel's conclusion that Hill's reinstatement should be conditioned upon further restitution efforts to Martin seems justified.

## Level of Supervision

Hill disputes the panel's statements that the level of supervision being requested is essentially that needed for a law clerk or intern and that Hill could perform the legal work he is currently doing without a license. Hill also disagrees with the panel's conclusion that Hill is requesting the creation of "a new type of limited practice."

Hill points out that the level of supervision requested is similar to that imposed in *In re Jones*, 253 Kan. 836, 861 P.2d 1340 (1993). *Jones* involved ethical violations comparable to those of Hill: allowing the statute of limitations to run on several cases and concealing that information from clients. Jones was in solo practice at the time of the violations and continued solo practice thereafter. The evidence indicated that he had a psychological problem—obsessive compulsive personality disorder—for which he was in therapy. Jones received an 18-month suspension, probated subject to several conditions, including supervision by another attorney on a monthly basis and continued therapy. Jones remained in solo practice. However, Jones did not suffer from the severe depression that afflicts Hill. Jones never reached the point where he had to sur-

render his files and give up practice entirely for some period of time.

The Disciplinary Administrator cites several recent cases involving attorneys with psychological problems committing ethical violations comparable to Hill's. Those attorneys were placed on supervised probation. See *In re Betts*, 257 Kan. 955, 895 P.2d 604 (1995) (nature of attorney's psychological problems at time of violations not disclosed in opinion; 2-year suspension imposed with supervised probation); *In re Pilgreen*, 257 Kan. 949, 896 P.2d 389 (1995) (attorney in depressed state at time of violations; at time of hearing, attorney in treatment and practicing law in an office-sharing setting; attorney suspended for 1 year with supervised probation); *In re Herman*, 254 Kan. 908, 869 P.2d 721 (1994) (attorney diagnosed with bipolar mood disorder and depression; at hearing, attorney's psychiatrist testified attorney can function effectively in practice if taking proper medication; attorney suspended for 24 months with supervised probation); *In re Meyer*, 251 Kan. 838, 840 P.2d 522 (1992)(attorney suffered from depression and sleep apnea at time of violations, but at time of hearing prognosis was good; attorney suspended and placed on supervised probation for 1 year).

In none of the above cases did the medical expert testify that the attorney was incapable of practicing law or did the attorney admit that he could not practice law in an independent setting. In addition, none of the above cases involved the level of supervision that Hill would need. Typically, the attorney supervision in the above cases involved monthly checks of the following: the status of each of the attorney's cases; the attorney's docketing system; management of discovery on all files; the status of client requests for information; and the trust account. Under that level of supervision, the supervised attorney is handling and fully responsible for his own cases. Someone else is merely checking the attorney's actions on a monthly basis. Also, in all of the above cases, suitable provisions for restitution to harmed clients had been made.

The panel did not feel Hill should receive any harsher punishment than other attorneys who had received supervised probation:

"The panel does not reach this decision because it wishes to punish respondent. Dr. Moeller feels that respondent should not be punished for his transgressions since he suffers from a mental disability which is the cause of the actions complained of. The panel makes this recommendation because it is concerned about the clients who might be represented by respondent. The respondent is not capable of practicing law. Therefore, he cannot be given a license to practice. When he is capable of practicing law, the Supreme Court may restore his license to him."

## Two-Year Suspension

Hill argues that the panel's recommendation of a 2-year suspension is not supported by the record. Hill refers to Dr. Moeller's response to the question of when Hill would be ready to return to independent practice: "I think he probably—I'd say one more year. Like I said, he's improving and by the end of that year, July of '96, we should see a recovery of just about all of what he is going to get back."

Hill points out that if this court follows the panel's recommendation and imposes a 2-year suspension, Hill will not be able to return to practice until sometime in 1998, a year and a half after Dr. Moeller indicated he would be ready. Hill also emphasized that he had voluntarily ceased active law practice beginning in March 1994 when he surrendered his files.

In recommending the 2-year suspension, the panel stated:

"It may well be that respondent can seek reinstatement at the end of one year if at the end of this time period he can offer evidence that he no longer suffers from his mental disability, is able to enter into an unrestricted practice of law and has made satisfactory restitution to Mr. Martin."

Under Rule 219 (1995 Kan. Ct. R. Annot. 229), Hill could petition for reinstatement before the 2-year suspension had expired, if he then felt capable of practicing law independently.

The Disciplinary Administrator attached to his brief a letter dated January 28, 1996, from Robert Kaplan. The letter indicates that Mr. Kaplan and the other two attorneys in his firm desire to have Hill become an associate, pending the disposition of his disciplinary proceeding. Kaplan is clearly anxious to get Hill back into the courtroom. The letter reiterates Kaplan's willingness to undertake the duties of supervised probation for Hill.

Hill's considerable skill and abilities as a lawyer are unquestioned. He apparently was able to function successfully in the courtroom, even at the time the violations occurred, because none of the attorneys working closely with him suspected anything was wrong until Steve Foulston learned of Hill's inaction. Hill's problems resulted from his inability to handle the stress of dealing with clients and the pressure of adhering to deadlines. The testimony at Hill's hearing indicated that Hill remained incapable of handling that stress and pressure. Thus, regardless of how well Hill may perform in the courtroom, he remains disabled in practicing law.

In the panel's view, even if Hill's license is suspended, he can continue to do the contract work that he has been doing for Kaplan: analyzing fact situations, preparing pleadings and briefs, assisting in case preparation generally. He cannot argue cases in court, even though he appears capable of doing that. As indicated above, that is not what caused his troubles.

With reference to the Martin matter, the panel commented:

"The panel is also extremely concerned about restitution to Mr. Martin and respondent's somewhat cavalier attitude about the fact that Mr. Martin is without remedy. Respondent was on the road to recovery when he discharged Mr. Martin's debt. The respondent's decision to discharge Mr. Martin's debt was not the result of his disability. While the panel understands the desire of respondent to get his affairs in order, a part of getting his affairs in order should have been resolving Mr. Martin's claim. The panel believes that respondent should not be reinstated to practice until restitution has been made to Mr. Martin or the Court has been given sufficient assurance that such restitution will be made in the very near future."

We agree that respondent's efforts towards restitution in the Martin matter should be considered at the time he seeks reinstatement.

## Conclusion

Hill's evidence in mitigation was impressive. A district judge and several prominent Wichita attorneys either testified or wrote letters on his behalf. The Disciplinary Administrator supports Hill's request for supervised probation. Hill appears to have in place a strong professional safety net in place in Kaplan's firm.

The panel's report is also thorough and well reasoned. We find that the panel's findings and conclusions are supported by clear and convincing evidence. The resolution of the appropriate sanction is difficult as evidenced by the division of this court. A majority of the court, guided by our standard of review in *Carson*, 252 Kan. at 406, adopts the recommendation of the panel.

IT IS THEREFORE ORDERED that Charles E. Hill be suspended from the practice of law for a minimum of 24 months from the date of October 16, 1995, the date of the panel's report, under Rule 203(a)(2) (1995 Kan. Ct. R. Annot. 191).

IT IS FURTHER ORDERED that respondent comply with Rule 218 (1995 Kan. Ct. R. Annot. 222), that the costs of the proceeding be assessed to the respondent, and that this order be published in the official Kansas Reports.

ALLEGRUCCI, J., dissenting.